IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERRIE L. GAGE, | ) |
|     Plaintiff, | ) ) ) |
| | ) Case No. 16 CV 8072 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO, DAVID ST. PIERRE, DENICE E. KORCAL, and EILEEN MCELLIGOTT, | ) ) ) ) ) ) ) |
|     Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Cherrie L. Gage is a management analyst for the Metropolitan Water Reclamation District of Greater Chicago. Plaintiff claims in her second amended complaint that the Water Reclamation District and three of its employees—David St. Pierre, Denice E. Korcal, and Eileen McElligott (together, "defendants")—discriminated against her because she is African American and retaliated against her because she filed a race discrimination suit in 2002. See Gage v. Metropolitan Water Reclamation District of Greater Chicago, No. 02 C 9369, 2004 WL 1899902, at *19 (N.D. Ill. Aug. 18, 2004) (granting summary judgment to the Water Reclamation District on some of plaintiff's claims). This court previously dismissed some of plaintiff's claims. Gage v. Metropolitan Water Reclamation District of Greater Chicagoland, No. 16 C 8072, 2017 WL 1739925, at *6 (N.D. Ill. May 3, 2017). Defendants move for summary judgment on plaintiff's race discrimination and retaliation claims. That motion is granted.

## BACKGROUND

Plaintiff's woefully inadequate summary judgment briefing made it difficult for the court to identify which facts are genuinely disputed. In short, plaintiff: (1) declined to respond to most of the facts in defendants' L.R. 56(a)(3) statement because that statement supposedly "violates the Court's standing order . . . that no statement filed under L.R. 56.1(a)(3) may contain more than 80 statements of uncontested fact"; (2) improperly introduces and cites facts in exhibits attached to her opposition to summary judgment, rather than doing so through her L.R. 56.1(b)(3) statement; (3) cites to deposition pages that she did not include in her exhibits; and (4) cites exhibits for assertions that they do not support. Given plaintiff's failure to comply with the basic rules governing summary judgment procedure, defendants rightly urge this court to reject plaintiff's attempt to dispute the facts. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

The court has nonetheless examined plaintiff's improperly cited exhibits and finds that considering them would not prejudice defendants. The court thus incorporates plaintiff's exhibits into the facts discussed below.

The facts below do not include acts that occurred before August 12, 2012. See Gage, No. 16 C 8072, 2017 WL 1739925, at *4 (N.D. Ill. May 3, 2017) (dismissing as time-barred "plaintiff's [section 1981] discrimination and retaliation claims based on alleged occurrences prior to August 12, 2012"). Nor are those acts within the limitations period for plaintiff's Title VII claims. This court declined to dismiss plaintiff's claims based on acts outside the limitations period because plaintiff had alleged continuing violations. Id. at *5. But on summary judgment, plaintiff presents no evidence that any of defendants' acts within Title VII's 300-day limitations period "contribut[ed]" to a pattern of discrimination that began outside the limitations

period. Dandy v. United Parcel Service, Inc., 388 F.3d 263, 270 (7th Cir. 2004). In fact—as discussed below—plaintiff offers no evidence of any discrimination within the limitations period.

\* \* \*

The facts are taken from the parties' L.R. 56.1 statements and from the depositions and exhibits. The material facts are not genuinely disputed. Plaintiff began working for the Water Reclamation District in 1989. She started as an Administrative Assistant, then became a Management Analyst. She was promoted to Management Analyst III in 2012. For the most part, plaintiff's suit involves her belief that defendants delayed her promotion from Management Analyst III to Supervising Budget and Management Analyst. Defendants finally promoted her in 2017—about a month after plaintiff filed her second amended complaint.

Plaintiff complains that defendants: (1) impeded her professional development by denying her promotion and by transferring her from Information Technology to General Administration; and (2) created a work environment "designed . . . to wear down" plaintiff and "make her quit her budding career."

## 1  Evidence of plaintiff's employment status

Plaintiff alleges that defendants impeded her professional development. She complains that she was: (1) denied a promotion to Supervising Budget Management Analyst in September 2014 and again in June 2015; and (2) transferred from IT to General Administration, which stripped her of her duties.

### 1.1  September 2014 – Sharon Fitzpatrick promoted over plaintiff

In September 2014, plaintiff was denied a promotion to Supervising Budget Management Analyst. The vacancy arose when the incumbent retired. After plaintiff and other candidates took the exam and interviewed for the promotion, defendants learned that the incumbent—Sharon

Fitzpatrick, a white woman—wanted to return to work, seeking an accommodation under the Americans with Disabilities Act. The Director of Human Resources, defendant Denice Korcal, sent a memorandum to Fitzpatrick's former supervisor. Korcal wrote that Fitzpatrick's medical records qualified her for an accommodation, and unless certain conditions were met—undue hardship for the employer, risk to other employees, or inconsistency with business necessity—they were "required to make a job accommodation." Korcal recommended that the supervisor approve Fitzpatrick's request. The supervisor did so. Fitzpatrick returned to her position.

### 1.2     June 2015 – Julie Ryan promoted over plaintiff

In June 2015, plaintiff was again denied a promotion to Supervising Budget Management Analyst. The vacancy was filled by Julie Ryan, a white woman. On the exam, Ryan scored in the same category as plaintiff; in the interview, Ryan scored two categories higher.

Ryan had been interviewed by three raters. One of them was Manju Sharma, Ryan's prospective supervisor. Sharma sent a memorandum recommending Ryan's appointment to the Executive Director, defendant David St. Pierre. Sharma wrote: "Ms. Ryan's analytical skills and the understanding of the Budget from her experience in General Administration, Maintenance and Operations, along with the Procurement Department, makes her uniquely qualified. Further, Ms. Ryan has, over the years, shown herself to be an exemplary employee in all positions held at the District." Sharma acknowledged that there was "an EEO recommendation for a minority," but noted Ryan's exam score—tied with one minority candidate, higher than the other—and her interview score, which was higher than both minority candidates.

Plaintiff's lawyer deposed Sharma. He asked her whether she tampered with Ryan's scores. Sharma denied doing so. Plaintiff's lawyer confronted Sharma with a document that Sharma did not recognize:

SUPERVISING BUDGET AND MANAGEMENT ANALYST

Candidates

| Raters | Ryan | Gage | Mardoian | Bradley | Lopatka |
|---|---|---|---|---|---|
| Sharma | 94 ~~84~~ | 79 | 82.5 | 83 | 94 ~~86~~ |
| Quintanilla | 92.7 | 85 | 83.55 | 89.8 | 90.95 |
| Soukup | 91 | 83.75 | 81.25 | 85.5 | 90.25 |
| AVG | 89.23333 | 82.58333 | 82.43333 | 86.1 | 89.06667 |

| SL | JR | CG | CM | KB |
|---|---|---|---|---|
| 8 | 7 | 9 | 8 | 9 |
| ~~15~~ | 15 | 12 | 15 | 13.5 |
| 15 | 15 | 9 | 10.5 | 10.5 |
| 10 | 10 | 9 | 9 | 8 |
| | 10 | 8 | 8 | 9 |
| 10 | 9 | 8 | 10 | 7 |
| 10 | 9 | 7 | 7 | 9 |
| 10 | 9 | 9 | 8 | 9 |
| 8 | 10 | 8 | 7 | 8 |
| 8 | | | | |
| 94 | 94 | 79 | 82.5 | 83 ~~?~~ |

5

Plaintiff's lawyer then questioned Sharma using the document. It was not fruitful:

Q. I'm handing to the court reporter what she's going to mark as Sharma Exhibit No. 1. Do you recognize that document?

A. No, I do not.

Q. Do you recognize the writing on the document?

A. I do not.

Q. It's not your writing?

A. No.

Q. Do you recognize it as Tony's writing?

A. I don't know what his writing looks like.

Q. You don't know what Tony's writing looks like?

A. Well, I mean, I suppose I would see it but it's been two years since I saw his writing.

* * *

Q. On Sharma 1 the writing there, that's not yours, correct?

A. No.

Q. And so next to your name it has Ryan listed at what score?

A. It's 84 crossed into 94.

Q. And Gage is a 79?

A. Uh-huh.

* * *

Q. And, then, the average is underneath would coincide with not the crossed off numbers but the un-crossed off numbers?

A. Let's see. Do they? I don't know. Let's check that.

Q. You can check it.

A. Okay. It's not the crossed off number but the other one.

Plaintiff's lawyer then moved on to other topics.

### 1.3   January 2016 – plaintiff transferred from IT to General Administration

In January 2016, plaintiff was transferred from IT to General Administration. When plaintiff transferred, she had few budget responsibilities: "For the first five to six months it was primarily training." She "conducted multiple training sessions with all the management" where she "trained them on HR related issues." All that "was very new" to plaintiff, so she "literally had to sit down and learn HR rules, the whole nine yards in order to be able to teach people." She "had to create a training manual for new MA's." She also "pulled together a training session for budget analysts as well as financial analysts," which required her to "work[ ] with the Lake Forest Graduate School of Management."

Six months after her transfer, plaintiff took on new budgeting responsibilities that she describes as "significant"—she "was responsible for reviewing all the capital budgets, capital bond fund, construction funds, storm water and the capital improvement overall budget."

## 2   Evidence of plaintiff's work environment

Plaintiff also alleges that defendants created a work environment that was hostile to her. She complains that: (1) defendant David St. Pierre implied at a budget meeting that he did not trust her; (2) defendant Denice Korcal wrongfully investigated an allegation that plaintiff acted "inappropriately" with her supervisor; and (3) defendant Eileen McElligott "transformed" plaintiff's questions about workplace profanity into a complaint about plaintiff's supervisor.

### 2.1   August 2015 – IT budget meeting: David St. Pierre

In August 2015, plaintiff attended a contentious IT budget meeting in which the Executive Director—defendant David St. Pierre—allegedly said, "I will not be subjected to this level of hostility and we are going to start this over." St. Pierre, who was "obvious[ly]" referring to plaintiff, left the room. When St. Pierre came back, he "acknowledged everyone in the room,"

7

asking, "Are you okay?" He then told the IT director, "I trust you"—implying by exclusion that he did not trust plaintiff, who testified that she found it a "very humiliating experience."

### 2.2 September 2015 – Kimbrough complaint: Denice Korcal

In September 2015, plaintiff's supervisee submitted a complaint. That supervisee, Geraldine Kimbrough, stated, "I saw my supervisor sitting at the directors desk in his chair and the director behind the desk too it was inappropriate and I felt uncomfortable." Kimbrough felt that plaintiff and the IT director "were conspiring and wanted to use their authority to bully me."

HR interviewed Kimbrough. The interviewers were, (1) the HR director, defendant Denice Korcal, and (2) the assistant director. In a post-interview memorandum to St. Pierre (the Executive Director), Korcal wrote: "Kimbrough did not provide any relevant detail to support her story, other than that [the IT director's] tie was loosened and they both looked like 'deer in the headlights.'"

The next day, Korcal and the assistant director interviewed plaintiff. Plaintiff testified that:

> [T]hey questioned my relationship with Mr. Sudduth whether or not I ever talked to him or dealt with him after work hours, if we ever went out together. They wanted to know if he ever touched me, if I had ever touched him, whether or not we have been in the office together with the door closed, whether I had been in his office with the doors closed, whether he had been in my office with the doors closed. And then at some point the question came up as to whether or not I had ever been in his office with my skirt up and whether or not I had been in his office with his shirt and tie off or his shirt off.

Plaintiff denied the allegations.

Korcal opined in her post-interview memorandum that Kimbrough was "not a credible witness"—she "used intimations, does not provide detail and makes vague references to conspiracies." She "bases her belief about a relationship between Gage and [the IT director] on

8

her distrust of Gage because of prior disagreements between Gage and herself." Korcal concluded that, "No further action is recommended." Two days later, Korcal sent Kimbrough a letter stating, "No evidence was found to support your allegations."

Plaintiff testified that she thought Korcal and St. Pierre fabricated Kimbrough's complaint: "[I]n my mind it appears that it's something that either Denice [Korcal] or the ED [St. Pierre] or the two of them together conjured up in order to further exasperate the situation."

### 2.3  April 2016 – workplace profanity: Eileen McElligott

In April 2016, plaintiff attended an HR training in which she "questioned the use of prolific profanity in the workplace" and asked how to handle the situation "in the event that the individual is a higher up." Plaintiff testified that she was referring to her supervisor—Shellie Riedle—but never mentioned her name. An HR manager emailed plaintiff, writing that the head of General Administration—defendant Eileen McElligott—"has handled this issue with Shellie."

Plaintiff wrote back, copying Korcal and stating that, "At no time did I indicate that I had concerns regarding my supervisor's behavior." Plaintiff expressed her concern that, "Such an accusation could have a devastating and long term impact on my work relationship with my supervisor, who is new to the District." Plaintiff was "in a state of disbelief that the HR department would take [such] a leap without having further conversations" with her and stated that, "I'm not sure if this is a malicious act or if there is a dire need for training for senior staff in HR." Korcal responded, "Cherrie, I think you are making too much of this."

## **DISCUSSION**

Plaintiff brings race discrimination and retaliation claims under Title VII and section 1981. Title VII and section 1981 share the same standards for liability. <u>Gonzalez v. Ingersoll Milling Machine Co.</u>, 133 F.3d 1025, 1035 (7th Cir. 1998). Defendants move for

9

summary judgment. Summary judgment is proper when a reasonable jury considering the evidence could return a verdict only for the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51 (1986). Drawing all justifiable inferences in plaintiff's favor, the court holds that defendants are entitled to summary judgment on each of plaintiff's claims.

**1      Race discrimination**

Employers may not discriminate against employees based on race. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. To defeat summary judgment, an employee claiming race discrimination must show that her employer took an adverse employment action against her based on her race. Abrego v. Wilkie, 907 F.3d 1004, 1012 (7th Cir. 2018). An adverse employment action "must be a significant change in employment status." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

The only employment actions that qualify as significant are plaintiff's denied promotions in 2014 and 2015. Because plaintiff offers no evidence that those denials were based on her race, defendants are entitled to summary judgment on plaintiff's race discrimination claims.

**1.1      Significant change in employment status**

To "distinguish meritorious cases from trivial personnel actions brought by irritable, chip-on-the-shoulder employees," employees must show that they suffered a "significant change" in employment status. Lewis v. Chicago, 496 F.3d 645, 653 (7th Cir. 2007) (citation, quotation marks, and alterations omitted). A change in employment status is significant when it affects: the employee's compensation or benefits (current wealth); the employee's job duties (future wealth); or the employee's job conditions, such that those conditions amount to a hostile work environment or constructive discharge. Id., citing Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744–45 (7th Cir. 2002). "[F]ailing to promote" an employee is an adverse employment

action, as is "reassign[ing]" an employee to a position "with significantly different responsibilities." Herrnreiter, 315 F.3d at 744–45, quoting Burlington Industries, 524 U.S. at 761.

Most of defendants' acts do not qualify as adverse employment actions. No reasonable jury could find that plaintiff suffered a hostile work environment or that her transfer from IT to General Administration significantly changed her job responsibilities.

**Hostile work environment.** No reasonable jury crediting plaintiff's testimony about St. Pierre, Korcal, and McElligott could reasonably find that they subjected plaintiff to a hostile work environment. Their alleged harassment was not so "severe or pervasive" as to render plaintiff's work environment "abusive." Scruggs v. Garst Seed Co., 587 F.3d 832, 840 (7th Cir. 2009). Plaintiff presents no evidence that they even acted improperly—much less evidence that their conduct was "extreme." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

According to plaintiff's testimony, St. Pierre felt that the room was "hostil[e]," left for a moment, came back, checked in with everyone to make sure that they were okay, and told the IT director, "I trust you." The court is at a loss to understand how plaintiff considered St. Pierre's conduct "very humiliating." More understandable is plaintiff's humiliation when Korcal asked her whether she had sexual contact with the IT director. But plaintiff does not argue that those questions were improper, given Kimbrough's insinuation that plaintiff and the IT director had inappropriate sexual contact at work. Plaintiff's objection is instead that Korcal and St. Pierre simply fabricated Kimbrough's complaint—a speculative objection unsupported by any evidence. Equally lacking in support is plaintiff's assertion that her questions about workplace profanity were "transformed as if she made a complaint against her new supervisor." Plaintiff was not told that her question was treated as a complaint. She was told by someone in HR that McElligott "handled this issue with Shellie." In response to plaintiff's accusations of malice,

11

Korcal quite sensibly wrote: "Cherrie, I think you are making too much of this. It is perfectly reasonable to give someone a heads up to avoid potential problems."

No reasonable jury could find that the acts of St. Pierre, Korcal, and McElligott, taken together, came anywhere close to creating a hostile or abusive work environment. See, e.g., Alexander v. Casino Queen, Inc., 739 F.3d 972, 982 (7th Cir. 2014) (affirming summary judgment for an employer on a hostile work environment claim when the employer had frequently subjected African-American employees to "unfair suspensions, financially harmful floor reassignments, unjustified write-ups, and unusually close supervision," and "knew about, but failed to remedy, their complaints of race discrimination"); Scruggs, 587 F.3d at 836, 840 (7th Cir. 2009) (affirming summary judgment for an employer on a hostile work environment claim when the employee's supervisor had told her that she was "made for the back seat of a car," was not "smart enough," was a "redneck," and looked like a "dyke").

**Transfer to General Administration.** Nor could a reasonable jury to find that plaintiff's transfer from IT to General Administration would cause her financial harm. See Herrnreiter, 315 F.3d at 744–45 (7th Cir. 2002) (holding that an accountant's transfer from investigations to auditing was not an adverse employment action, reasoning that although "[t]he use of a company car and being excused from having to sign in or out of an office might be preferred by some employees," the jobs were "equivalent other than in idiosyncratic terms"). When she transferred, plaintiff had few budget responsibilities. For six months, she was required to: (1) train management on HR issues; (2) create a training manual for new management analysts; and (3) train budget and financial analysts, which required her to work with the Lake Forest Graduate School of Management. Plaintiff then took on new budgeting responsibilities—she "was

responsible for reviewing all the capital budgets, capital bond fund, construction funds, storm water and the capital improvement overall budget."

Plaintiff presents no evidence that her career was harmed because she had to train management on HR issues and other management analysts. She testified that other management analysts in prior years had conducted the same training. And when Defendant McElligott—the head of General Administration—was asked why plaintiff's responsibilities changed, McElligott testified that, "We wanted to have Cherrie work on the training, the districtwide budget analyst training, and we wanted to get Cherrie involved in the engineering budget, specifically the capital budget." There is no evidence that those new responsibilities "stunted" plaintiff's career, Herrnreiter, 315 F.3d at 744 (7th Cir. 2002), no dispute that plaintiff maintained the same level of compensation and benefits, and no dispute that after six months, plaintiff took on budgeting responsibilities that she describes as "significant." No reasonable jury could find that plaintiff's transfer to General Administration was an adverse employment action.

### 1.2  Denied promotions based on race

Unlike her transfer to General Administration, plaintiff's denied promotions to Supervising Budget Management Analyst clearly affect her future wealth. Those denials were adverse employment actions. No reasonable jury, however, could find that plaintiff was denied those promotions based on her race.

An employee claiming race discrimination can defeat summary judgment by using the burden-shifting framework created by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Mourning v. Ternes Packaging, Indiana, Inc., 868 F.3d 568, 570–71 (7th Cir. 2017), citing Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765–66 (7th Cir. 2016). Under McDonnell Douglas, the employee must show a prima facie case of discrimination by showing

13

that she is a member of a protected class, she met her employer's job expectations, she suffered an adverse employment action, and she was treated less favorably than similarly situated employees outside of her protected class. Naficy v. Illinois Dep't of Human Services, 697 F.3d 504, 511 (7th Cir. 2012). If the employee shows a prima facie case of discrimination, the employer must introduce a nondiscriminatory reason for the employment action. Id. The employee can then defeat summary judgment by offering evidence that the employer's reason is pretextual. Id. at 511–12. The ultimate question is whether a jury could find that the employee's race caused the adverse employment action. Ortiz, 834 F.3d at 765 (7th Cir. 2016).

The parties agree that plaintiff was a member of a protected class, met her employer's expectations, and suffered an adverse employment action. The question is whether plaintiff has shown that she was treated less favorably than similarly situated employees. She has not done so and thus fails to establish a prima facie case of discrimination.

**Similarly situated employees.** To show that she was treated less favorably than similarly situated employees, plaintiff "must identify at least one employee who is directly comparable to her in all material respects." Perez v. Thorntons, Inc., 731 F.3d 699, 704 (7th Cir. 2013). She has not done so. Sharon Fitzpatrick and Julie Ryan were not similarly situated. Fitzpatrick returned to her position after she sought an accommodation under the Americans with Disabilities Act. Korcal wrote to Fitzpatrick's former supervisor that Fitzpatrick qualified for an accommodation, opining that they were "required to make a job accommodation." Plaintiff presents no evidence disputing the sincerity of Korcal's opinion. And if defendants sincerely believed that they were required to accommodate Fitzpatrick, Fitzpatrick and plaintiff plainly were not directly comparable. Nor was plaintiff directly comparable to Ryan, who tied plaintiff on the exam, but

scored two categories higher in her interview. See Thanongsinh v. Board of Education, 462 F.3d 762, 775 (7th Cir. 2006) (treating interview performance as a material variable).

**Flaws in the interview process.** Plaintiff counters that the interview process is a smokescreen for discrimination. She offers three reasons. None of them is persuasive. First, plaintiff rightly suggests that the opacity and subjectivity of the interview process might hide discrimination against African American candidates. That argument might be relevant to a disparate impact claim. See generally Griggs v. Duke Power Co., 401 U.S. 424, 430 (1971) ("Under the [Civil Rights] Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."). Plaintiff alludes to a disparate impact claim in her complaint, but on summary judgment presents no evidence and only a perfunctory argument. The claim is waived. See United States v. Cisneros, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quotation marks omitted).

Second, plaintiff argues that the interviews are "flawed and manipulated." Plaintiff testified that she once participated on an interview panel. The interviewers' scores had "to be within a single point of each other." Plaintiff explained that, "You can't have these big gaps because HR department doesn't want to be questioned about it," so the interviewers have a "discussion . . . going back and forth with the interviewer." Requiring interviewers to discuss the candidates and requiring them normalize their scores to a one-point range surely has some value—open-minded interviewers might change their scores; a narrow range might soothe the feelings of low-scoring candidates. Yet there is wisdom in plaintiff's approach: a panel's collective judgment might well be more accurate if it comprises independent scores.

But questions like that are not for courts to decide. See Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 532 (7th Cir. 2003) ("[C]ourts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions.").

Finally, plaintiff insinuates that Sharma tampered with her interview score sheet to ensure that Ryan would score the highest. That suggestion is totally unsupported. First, plaintiff laid no foundation for the document that she asserts is Sharma's score sheet. Sharma testified that she did not recognize the document or the handwritten changes to Ryan's score. Consequently, the score sheet is inadmissible as evidence. Second, Sharma had no reason to lie. If it was her score sheet, she presumably was entitled to change her scores—whether because she changed her mind or because she realized that she had made a clerical error. Nor would Sharma have needed to change Ryan's score to ensure Ryan's placement in the highest interview category: even with the original score of 84, Ryan had the highest average interview score among the candidates. Third, many innocent explanations could explain why Ryan's score was altered—for example, the person who entered the scores onto the printed score sheet could have transcribed Sharma's scores incorrectly and decided to correct the errors in ink.

The non-moving party at summary judgment is entitled to inferences that are reasonable—not "speculative." See Reid v. Kohl's Department Stores, Inc., 545 F.3d 479, 482 (7th Cir. 2008) (affirming summary judgment against a plaintiff who slipped on a milkshake and rejecting an inference about how long the milkshake had been on the floor based on its texture, reasoning that, "The record is devoid of any facts which would have given insight into the relevant time frame."). The score sheet might have been promising grounds for further discovery. Without more, it does not save plaintiff from summary judgment.

## 2   Retaliation

Plaintiff also brings retaliation claims. To survive summary judgment, plaintiff's evidence must allow a reasonable jury to find that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected activity and adverse employment action. Lewis v. Wilkie, 909 F.3d 858, 866 (7th Cir. 2018). The parties agree that plaintiff engaged in a protected activity when she filed an employment discrimination suit in 2002. See 42 U.S.C.A. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . .  because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008) (holding that section 1981 "encompasses claims of retaliation").

The only employment actions sufficient to deter protected activity—and thus, the only actions that were adverse—are plaintiff's denied promotions in 2014 and 2015, and arguably her transfer to General Administration. Plaintiff offers no evidence, however, that any of those employment actions were causally linked to her 2002 discrimination suit. Defendants are thus entitled to summary judgment on plaintiff's retaliation claims.

### 2.1   Employment action sufficient to deter protected activity

A jury crediting plaintiff's testimony about St. Pierre, Korcal, or McElligott could not reasonably find that their behavior amounted to an adverse employment action. The employment discrimination statutes protect employees not from "petty slights, minor annoyances, and simple lack of good manners," but from employer actions "that are likely to deter victims of discrimination" from engaging in protected activity—for example, complaining to the Equal

Employment Opportunity Commission or filing a discrimination suit. Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006) (citation and quotation marks omitted).

Plaintiff offers no evidence that St. Pierre, Korcal, or McElligott acted improperly in any way, much less evidence that their acts would deter a victim of discrimination from seeking to vindicate her rights. St. Pierre's "humiliation" of plaintiff at the IT budget meeting, at which St. Pierre declined to say that he trusted plaintiff, Korcal's investigation of Kimbrough's complaint, which concluded that Kimbrough was not credible, and McElligott's talk with plaintiff's supervisor, which addressed plaintiff's concerns about workplace profanity—even a sympathetic jury could not reasonably find that these actions were anything more than petty slights, minor annoyances, or simple lack of good manners.

Plaintiff's evidence about St. Pierre, Korcal, or McElligott simply does not come close. The Court of Appeals has affirmed grants of summary judgment against employees who suffered employment actions that were far more likely to deter protected activity: (1) telling an employee to withdraw her sexual harassment complaint, warning her that "paybacks are hell"; (2) requiring the presence of another witness in a room before deigning to meet an employee for fear of "false accusations"; and (3) turning the tape recorder off during a department meeting and saying, "I know people in Washington, D.C. and if you file a complaint, they are going to send it back to me and I'm going to deal with you." Dunn v. Washington County Hospital, 429 F.3d 689, 692 (7th Cir. 2005) (affirming summary judgment for the employer on a retaliation claim under Title VII); Lewis, 909 F.3d at 868–69 (7th Cir. 2018) (same); Poullard v. McDonald, 829 F.3d 844, 850 (7th Cir. 2016) (same). Plaintiff's evidence of her work environment does not save her retaliation claims from summary judgment.

### 2.2 Causally linked to protected activity

In contrast, being denied promotions surely could deter protected activity. Plaintiff's transfer to General Administration is a closer call, but that does not matter: plaintiff offers no evidence that any of those events—which took place in 2014, 2015, and 2016—were causally linked to her 2002 suit. (The same reasoning applies to plaintiff's complaints about St. Pierre, Korcal, and McElligott). Nor does plaintiff offer any evidence that her denied promotions or transfer were otherwise improper.

### CONCLUSION

For the reasons described above, the court grants summary judgment in favor of defendants Denice E. Korcal, David St. Pierre, Metropolitan Water Reclamation District of Greater Chicago, and Eileen M. McElligott.

**ENTER:** **September 26, 2019**

_Robert W. Gettleman_
Robert W. Gettleman
United States District Judge